# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

MIDAMERICA DIVISION INC. D/B/A/
HCA-MIDWEST DIVISION,

        *Plaintiff,*

v.

                                    Case No. 23-2551-EFM

FIRST HEALTH GROUP CORP. et. al.,

        *Defendants.*

## MEMORANDUM AND ORDER

Before the Court are three motions for summary judgment, one filed by each party in this case (Docs. 166, 170, & 174). Plaintiff MidAmerica Division Inc. d/b/a/ HCA-Midwest Division ("MidAmerica") moves for summary judgment in its favor on its declaratory judgment and breach of contract claims against Defendant First Health Group Corp. ("First Health") and its *quantum meruit* claim against Defendant Cox Healthplans, LLC ("Cox"). Both Defendants move for summary judgment in their favor on the respective claims against them. For the reasons explained below, the Court grants Defendants' motions and denies MidAmerica's motion.

## I.      Factual and Procedural Background[1]

This case arises out of a long and complex relationship between various players in the health insurance industry.[2] MidAmerica is a healthcare corporation which operates various

---

[1] In accordance with summary judgment procedures, the Court has laid out the uncontroverted material facts. The facts, where controverted, are noted as such.

[2] The long and complex relationship between the parties understandably resulted in lengthy briefing on the summary judgment motions before the Court. While all the parties' briefs could certainly be more concise, Cox goes so far as to argue that MidAmerica violated Federal Rules of Civil Procedure 1 and 56 and D. Kan. R. 56.1 by providing 135 statements of fact ("SOF") and failing to cite 100 of them against Cox. But MidAmerica cited 74 of those SOFs in its argument against First Health. Most of the remaining 26 SOFs not cited against either party provide relevant

hospitals throughout the country. Cox is a health insurance company. First Health is a network of healthcare providers (the "First Health Network") acting as a link between providers and insurance companies such as MidAmerica and Cox. First Health contracts with various hospital entities to participate in the First Health Network as providers. Separately, First Health contracts with insurance companies for access to the First Health Network which charges the insurance companies lower rates.

On November 1, 2004, First Health and MidAmerica executed a Model Facility Agreement ("Provider Agreement"). The two parties heavily dispute the rights and obligations under the Provider Agreement and whether it controls in this case, but both parties stipulate to its admissibility. Aetna Health, Inc. ("Aetna") later acquired First Health's assets in 2013.

Several years later, the three patients giving rise to MidAmerica's claims received medical services at Overland Park Regional Medical Center, one of MidAmerica's hospitals. Patient 1 was treated in 2018 for injuries sustained in a motor vehicle accident and Patients 2 and 3 were treated in late 2019 and early 2020 for complications stemming from their premature birth. Cox insured Patients 2 and 3.[3] MidAmerica submitted claims for Patient 1 on July 27, 2018, and for Patients 2 and 3 on August 5, 2020, and November 10, 2020, respectively.

In January 2020, Aetna executed a Managed Care Agreement ("MCA") with MidAmerica and several other hospitals. The MCA contains a Governing law provision which states: "This

---

background information or even appear in Cox's own motion and response. Cox laments MidAmerica's inefficiency yet seemingly would prefer MidAmerica to have written a separate motion for each Defendant. Further, Cox provided its own list of technical disputes to MidAmerica's SOFs that is similarly inefficient for the Court to review. Accordingly, the Court will not further entertain Cox's objections on the matter.

[3] MidAmerica and Patient 1's insurance company, International Medical Group, Inc. ("IMG"), previously reached a settlement agreement, and MidAmerica voluntarily dismissed IMG as a defendant to this case. Docs. 69 & 116.

Agreement shall be governed in all respect by the laws of the State of Missouri." Other relevant

MCA provisions are stated below.

> This Managed Care Agreement ("Agreement") is made and entered into by and
> between U.S. Healthcare, Inc., d/b/a/ Aetna U.S. Healthcare, a Missouri
> corporation, on behalf of itself and its affiliates (as defined below) (hereinafter
> "Company") and [MidAmerica] . . . (collectively and severally "Hospital" or
> "Hospitals").

Subsequently, MidAmerica and Aetna "on behalf of itself and its affiliates" entered into an

Amendment to the MCA, specifically to bring MidAmerica's agreement to participate in the First

Health Network under the scope of the MCA:

> This Amendment (the "Amendment") is made as of August 1, 2020 (the "Effective
> Date"), between Aetna Health Inc., a Pennsylvania corporation, on behalf of itself
> and its Affiliates (hereinafter referred to as "Company") and MidAmerica Division,
> Inc.. dba HCA Midwest Health System (hereinafter referred to as "Provider").
>
> . . .
>
> **WHEREAS**, the parties desire to amend the Agreement to add a 'Medical Records
> Products Addendum' . . . specifically for the First Health network.

The Amendment also contains a Medical Records Products Addendum ("Addendum"). There is a

covenant in the Addendum, stating in pertinent part:

> 3. <u>Payment</u>. . . . [MidAmerica] understands and agrees that the applicable Payer
> . . . and not Company is responsible for paying [MidAmerica] claims and fees for
> Covered Services related to the Medical Rental Products, and that, in no event, shall
> Company be responsible for funding claims or paying provider, in whole or in part.
> [MidAmerica] agrees that it shall not file suit against Company as a result of any
> Payer's or Member's nonpayment or underpayment. Company shall use best efforts
> to assist in resolving any claim dispute between Payer and [MidAmerica].[4]

---

[4] The Addendum describes the parties as "Company" and "Hospital." In this quoted provision, the Court
substitutes "MidAmerica" for "Hospital" to improve clarity since MidAmerica does not dispute it is "Hospital" as
used in the Addendum.

The MCA, along with its Amendment and Addendum, worked to terminate the previous Provider Agreement between MidAmerican and First Health. This was confirmed in an email sent by an Aetna representative to a MidAmerica representative which states in pertinent part:

> [The] Model Facility Agreement effective November 1, 2004 ("Agreement") was and is terminated, effective December 31, 2020. The termination of the First Health Group Corp. Agreement is based upon the following salient facts:
>
> . . .
>
> On or around August 1, 2020, all remaining health plan participants still receiving benefits through access to the First Health Group Corp. Agreement were migrated over to, i.e., began receiving their benefits via access to, a separate and distinct managed care participant agreement between Aetna and MidAmerica Division, Inc. that exists in the same markets.

MidAmerica's claims for Patients 1, 2, and 3 were not paid in full. Rather, after conducting audits, the insurance company for Patient 1 only paid a portion of the claim on November 16, 2018. Additionally, Cox only paid a portion of the Patient 2 claim on September 24, 2020, and the Patient 3 claim on January 19, 2021. MidAmerica did not notify First Health of the dispute surrounding these partial payments until October 18, 2021, for Patients 2 and 3, and July 20, 2023, for Patient 1. First Health did not take any action against Cox after receiving MidAmerica's notifications.

Seeking the remaining amount of the Patients 1, 2, and 3 claims, MidAmerica sued First Health and Cox under various legal theories, many of which the Court previously dismissed.[5] The remaining claims include MidAmerica's declaratory judgment claim against First Health seeking declaration that the Provider Agreement controls the obligations between MidAmerica and First Health in this case instead of the MCA. As such, MidAmerica alleges its breach of contract claim against First Health solely as a breach of the Provider Agreement. Further, MidAmerica seeks

---

[5] Doc. 131.

recovery from Cox based on *quantum meruit* alleging it conferred various benefits onto Cox. Each party now moves for summary judgment.

## II.    Legal Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[6] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[7] The movant bears the initial burden of proof to show the lack of evidence on an essential element of the claim.[8] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[9] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[10] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[11]

This same standard applies to cross motions for summary judgment.[12] Each party bears the burden of establishing that no genuine issue of material fact exists and entitlement to judgment as a matter of law.[13] "Cross-motions for summary judgment are to be treated separately; the denial of

---

[6] Fed. R. Civ. P. 56(a).

[7] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[8] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[9] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[11] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[12] *R.C. by S.P. v. J.C.*, 736 F. Supp. 3d 1050, 1057 (D. Kan. 2024).

[13] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

one does not require the grant of another."[14] But where the cross motions overlap, the Court may permissibly address the legal arguments together.[15] The Court views each motion in the light most favorable to its nonmoving party.[16]

## III.    Analysis

MidAmerica moves for summary judgment on its declaratory judgment and breach of contract claims against First Health. MidAmerica also moves for summary judgment on its *quantum meruit* claim against Cox. Both Defendants move for summary judgment against MidAmerica. The Court addresses the claims against First Health and Cox in turn.

### A.    Claims against First Health

There are two contract provisions at issue between MidAmerica's claims against First Health: § 4.4 of the Provider Agreement and § 3 of the Addendum to the MCA's Amendment. MidAmerica seeks judicial declaration against First Health defining the rights and obligations of MidAmerica and First Health under the Provider Agreement, asserting that it is the controlling document between the two parties regarding the disputed claims in this case. First Health counters that MCA, its Amendment and Addendum—and, importantly, the Addendum's purported covenant not to sue—controls instead.[17] Before the Court can address MidAmerica's claims

---

[14] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citation omitted).

[15] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

[16] *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

[17] At the pretrial conference, MidAmerica objected to First Health's defense that the MCA controls instead of the Provider Agreement, arguing that First Health failed to plead in its Answer to the Second Amended Complaint. *See* Doc. 164 p. 24–28. As noted by the Magistrate Judge, First Health did assert that "Plaintiff cannot recover on any claims for which First Health has no legal responsibility for the payment" in its Answer and explained the MCA's relevance in its interrogatory response such that MidAmerica was on notice about the defense, thus declining to strike the defense from the Pretrial Order. *Id.* at 26–28. In its briefing, MidAmerica continues to point out that First Health never expressly mentioned the MCA in the Answer. But the Court sees no reason to depart from the Magistrate Judge's reasoning at the summary judgment stage.

against First Health on the merits, it must determine which contract controls the rights and obligations presently disputed between MidAmerica and First Health.

The convoluted dispute over which contract provision controls lies primarily in a matter of timing. The Provider Agreement was terminated effective December 31, 2020, whereas the MCA Amendment and its Addendum did not become effective until August 1, 2020. Despite its termination, MidAmerica asserts that the Provider Agreement controls in this case because the services underlying MidAmerica's claims against First Health were provided prior to August 1, 2020.

The Court gleans three main arguments in support of MidAmerica's position that the MCA does not control: (1) "Company" as used in the MCA's Addendum only includes Aetna, not First Health; (2) even if First Health is included in "Company," the Addendum does not retroactively apply to MidAmerica's claims for the services it provided to Patients 1, 2, and 3; and (3) even if the Addendum applies, its purported covenant not to sue is invalid under Missouri law. Each argument necessarily requires the Court to interpret the MCA's language.

Because the MCA's governing law provision states Missouri law applies, the Court interprets the MCA under Missouri law.[18] The Court begins with the plain meaning of a contract's words to determine the parties' intent.[19] "The clauses must be read in the context of the entire contract, and interpretations that render provisions meaningless should be avoided."[20] When the contract is clear and unambiguous, the Court must apply the contract as written without supplying

---

[18] *See TH Agric. & Nutrition, L.L.C. v. Ace Eur. Grp. Ltd.*, 416 F. Supp. 2d 1054, 1075 (D. Kan. 2006) ("Kansas is the forum state and, as to contract-based claims, Kansas choice of law rules honor an effective choice of law by contracting parties.") (citations omitted).

[19] *Cheek v. Cheek*, 669 S.W.3d 155, 159 (Mo. Ct. App. 2023) (citing *McGuire v. Lindsay*, 496 S.W.3d 599, 607 (Mo. Ct. App. 2016)).

[20] *McGuire*, 496 S.W.3d at 607 (citation omitted).

additional terms.[21] "The test for ambiguity is whether the disputed language, in the context of the entire agreement, is reasonably susceptible to more than one construction."[22] An ambiguity "must come from within the four corners of the contract; extrinsic evidence cannot be used to create an ambiguity."[23]

### 1.    The MCA Amendment and its Addendum Include First Health in "Company"

Turning to the plain language of the MCA itself, it describes "Company" in the first paragraph as "U.S. Healthcare, Inc., d/b/a Aetna U.S. Healthcare, a Missouri corporation, on behalf of itself and its Affiliates (as defined below) (hereinafter 'Company')." Below this, the MCA defines "Affiliate" as "any corporation, partnership or other legal entity (including any Plan) directly or indirectly owned or controlled by, or which owns or controls, or which is under common ownership or control, with Company." The Amendment to the MCA also describes "Company" as Aetna and "its Affiliates (hereinafter 'Company')" and goes on to state that the Amendment is "specifically for the First Health network."

Under the MCA's plain language, First Health squarely falls within the definition of "Affiliate" because Aetna acquired control over First Health and its assets in 2013. MidAmerica recognizes as much in its own brief arguing for summary judgment.[24] MidAmerica, however, argues that "Company" does not include First Health because First Health, as an entity, is not explicitly named as a party to the agreement.

---

[21] *Cheek*, 669 S.W.3d at 159 (citation omitted).

[22] *McGuire*, 496 S.W.3d at 607 (citation omitted).

[23] *Id.* (citation omitted).

[24] *See* Doc. 171 p. 9, ¶ 42 ("Aetna became affiliated with First Health when it purchased another entity, Coventry Health Care Inc. ("Coventry"), and brought First Health in as an affiliate.")

The Court disagrees. First, the original MCA and the Amendment's placement of "(hereinafter 'Company')" directly after describing Aetna as acting "on behalf of itself and its Affiliates" plainly includes Aetna's affiliates—i.e., First Health—within the use of "Company."[25] Additionally, the Amendment and Addendum explicitly recognize First Health, at minimum, as a relevant party, as both were executed "specifically for the First Health network" and for "First Health®."

Contractual language aside, neither party disputes that the Amendment and its Addendum were entered into specifically to bring MidAmerica's agreement to participate in the First Health Network—originally executed with First Health itself—under the scope of the MCA in lieu of the Provider Agreement, which was terminated shortly after the Amendment was executed. The Addendum itself recognizes that another agreement could control, stating that "[i]n the event that [MidAmerica] participates in a Medical Rental Product under a separate agreement with a Company Affiliate . . . such other agreement shall govern." But as of December 31, 2020, the Provider Agreement between MidAmerica and First Health has been terminated and MidAmerica's access to the First Health Network was "migrated over to . . . a separate and distinct managed care participant agreement" (the MCA). No other possible controlling agreement between them currently exists. Reading "Company" as limited to Aetna and not including First Health under these circumstances would impermissibly render the Amendment and Addendum's

---

[25] "Hereinafter" primarily functions as an adverb defined as meaning "later in this document." *Hereinafter*, BLACK'S LAW DICTIONARY (12th ed. 2024). It is used in legal documents to indicate a specified shortened form of a subject that would otherwise be cumbersome to refer to in full. *Cf.* THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. 4.2(b) (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020). Legal writers place "hereinafter" directly after the subject to be referred to in the specified shortened form later in the document, but before any additional explanatory material. *Id.* Here, had the parties intended to only include Aetna as "Company," they should have placed "(hereinafter 'Company')" *before* describing Aetna as acting on behalf of itself "and its affiliates."

function to supersede the Provider Agreement meaningless.[26] Accordingly, the Court concludes that First Health is included in "Company" as used by the MCA Amendment and the Addendum's purported covenant not to sue.

2.    *The Addendum Applies to MidAmerica's Claims Against First Health*

MidAmerica next contends that the Addendum's purported covenant not to sue cannot apply to its claims. This argument is two-fold: (1) MidAmerica asserts its claims accrued on the dates it provided services to Patients 1, 2, and 3, prior to the Addendum's effective date; therefore (2) the only way the Addendum can apply to these claims is if it is retroactive, which MidAmerica asserts it is not. The Court first addresses whether the Addendum is retroactive.

Generally, parties must clearly intend that an obligation retroactively applies for it to do so.[27] On one hand, the Addendum's purported covenant not to sue does not contain any language constraining its applicability to certain dates of service. On the other, there is no language indicating that the parties intended for the covenant to apply retroactively. The language that does appear states that the Addendum's "effective date" is "as of August 1, 2020,"—no sooner, no later. Because "the court does not have the power to rewrite the contract for the parties" under Missouri law, the Court declines to write in a provision stating the Addendum applies to any period prior before August 1, 2020.[28] Thus, the question of whether the purported covenant not to sue applies to MidAmerica's claims requires the Court to determine the date MidAmerica's claims against First Health arose.

---

[26] *See Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003) ("[E]ach term of a contract is construed to avoid rendering other terms meaningless.").

[27] *Cf. Cedar Cnty. Comm'n v. Governor Michael Parson*, 661 S.W.3d 766, 774 (Mo. 2023) ("Retroactivity is a matter of statutory construction, i.e., retroactive application must be compelled by or necessarily inferred from the language of the statute.").

[28] *Gabriel v. Shelter Mut. Ins. Co.*, 897 S.W.2d 119, 120–21 (Mo. Ct. App. 1995).

Without citing any legal authority, the parties propose different dates for when MidAmerica's claims against First Health arose. MidAmerica asks the Court to consider the dates the services were performed, which would place the origin of MidAmerica's three claims in 2019 and early 2020—before the Addendum became effective. First Health asks the Court to consider the dates MidAmerica sent written notices to First Health regarding the alleged underpayments, which would place the origin of MidAmerica's three claims in 2021 and 2023—after the Addendum became effective. Alternatively, First Health asks the Court to consider the dates the alleged underpayments were made, which would place MidAmerica's claims for Patients 2 and 3 under the Addendum, but not its claim for Patient 1.

Here, the type of claim that MidAmerica asserts informs the answer to the question. MidAmerica asserts a breach of contract theory against First Health for the alleged underpayments on the claims it filed for Patients 1, 2, and 3. Specifically, MidAmerica contends that it "reasonably expected that if they were not paid correctly, *that upon notification to First Health*, First Health would collect the payments from the Payors, with whom it had a contract, and over which it exercised contractual control."[29] "A cause of action for breach of contract does not accrue until after the contract is breached."[30] By its own theory, MidAmerica identifies that the point of breach occurred when it notified First Health about the alleged underpayments, and First Health failed to take action. MidAmerica did not notify First Health of the alleged underpayments for Patients 2 and 3 until October 18, 2021, and for Patient 1 until July 20, 2023.

---

[29] Doc. 164 p. 7 (emphasis added).

[30] *Pro. Funding Co. v. Bufogle*, 655 S.W.3d 243, 248 (Mo. Ct. App. 2022) (citation omitted). MidAmerica and First Health dispute whether Kansas or Tennessee Law governs the Provider Agreement, but this principle is also consistent in both Kansas and Tennessee contract law. *Pizel v. Zuspann*, 247 Kan 54, 795 P.2d 42, 54 (1990) ("A cause of action for breach of contract accrues when a contract is breached."); *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn Ct. App. 2009) ("A cause of action for breach of contract accrues on the date of the breach.").

Because the notifications, and First Health's alleged breach, occurred after the Addendum's effective date of August 1, 2020—and even after the Provider Agreement's termination date of December 31, 2020—the Court concludes that MidAmerica's claims arose after the Addendum's effective date. Accordingly, the Addendum and its purported covenant not to sue governs the rights and obligations between MidAmerica and First Health in this case.

3.    *The Court Will Not Evaluate Whether the MCA Contains a Valid Covenant Not to Sue Under Missouri Law*

In its response, MidAmerica makes a one-sentence argument that the covenant not to sue is invalid under Missouri law because it does not reflect consideration to MidAmerica for a release of its claims against First Health. MidAmerica cites *Kansas City v. Southwest Tracor Inc.* for support, which merely states that "[a] release is a contract requiring consideration."[31] First Health somewhat responds to this argument in footnote, not by explaining how the covenant is supported by consideration, rather, by distinguishing the facts of *Tracor* and stating that this is the first time MidAmerica has alleged the covenant is not supported by consideration.

The Court, however, will not evaluate the validity of the covenant not to sue at this time. MidAmerica has only ever asserted that its breach of contract claim is based upon the Provider Agreement. MidAmerica has never pled that First Health breached the MCA—the controlling document between the two parties as a matter of law—despite having multiple opportunities to amend its complaint throughout the case.[32] MidAmerica's breach of contract claim misidentified the controlling contract between it and First Health and consequently cannot establish a breach of

---

[31] 71 S.W.3d 211, 215 (Mo. Ct. App. 2002).

[32] *See* Docs. 24 & 85. MidAmerica's request to amend its Complaint for a third time was ultimately denied. *See* Doc. 230.

contract claim under the Provider Agreement.[33] Put simply, the question of whether First Health breached the MCA has not been presented to the Court. Accordingly, First Health is entitled to summary judgment on MidAmerica's claim that First Health breached the Provider Agreement.[34]

### B.    *Quantum Meruit* Against Cox

The remaining claim to address is MidAmerica's *quantum meruit* claim under Kansas law against Cox for the reasonable value of the services it provided to Patients 2 and 3. A *quantum meruit* claim under Kansas law requires MidAmerica to show (1) a benefit was conferred upon the defendant by the plaintiff; (2) the defendant knew of or appreciated the benefit, and (3) the defendant's acceptance or retention of the benefit without payment creates inequity.[35] The parties' dispute primarily lies in whether MidAmerica can establish elements (1) and (2). Further, Cox argues that MidAmerica's *quantum meruit* claim is unavailable as a remedy. The Court addresses this argument first before addressing the substance of MidAmerica's *quantum meruit* claim.

### 1.    Quantum Meruit *is Available as a Potential Remedy*

In a footnote in its previous motion to dismiss, Cox briefly argued that MidAmerica's *quantum meruit* claim was unavailable because a written contract governed MidAmerica's and Cox's obligations to each other. The Court disagreed, concluding that no contract governs the obligations between MidAmerica and Cox. Cox makes a similar argument for summary judgment,

---

[33] To establish its breach of contract claim, MidAmerica must show "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1098 (2013). By misidentifying the controlling contract, MidAmerica fails to establish, at minimum, elements (1), (4), and (5).

[34] In no way does this Order preclude MidAmerica from refiling a breach of contract claim against First Health under the MCA in a new case.

[35] *Midwest Grain Prods., Inc. v. Envirofuels Mktg., Inc.*, 139 F.3d 912 (Table), 1998 WL 63077, at *5 (10th Cir. 1998) (applying Kansas law and citing *J.W. Thompson Co. v. Welles Prods. Corp.*, 243 Kan. 503, 758 P.2d 738, 745 (1988)).

arguing that MidAmerica has an adequate remedy for breach of contract against First Health which renders unavailable any further recovery under *quantum meruit* against Cox.

But *quantum meruit* is not rendered unavailable against one defendant simply because a valid contract binds the plaintiff to another. It is true that under Kansas law, "[r]ecovery for payment under the terms of a contract and recovery for quantum meruit are mutually exclusive legal concepts."[36] Consequently, recovery under *quantum meruit* is generally unavailable when there is a written contract that addresses the dispute.[37] *Quantum meruit*, however, remains available as a remedy in certain cases.[38] For example, *quantum meruit* is available as an alternative remedy in cases where the existence of a contract is disputed.[39] *Quantum meruit* is also available in certain cases involving multiple defendants, such as when there is a contract binding the plaintiff and one defendant, but no contract binding the plaintiff and a different defendant.[40]

This case presents the latter circumstance. The Court previously ruled that MidAmerica sufficiently pled that there was a contract binding MidAmerica and First Health, but no contract binding MidAmerica and Cox.[41] Because no valid breach of contract claim exists between MidAmerica and Cox, *quantum meruit* is available to MidAmerica as a remedy against Cox if MidAmerica can establish the elements of the claim.

---

[36] *Midwest Asphalt Coating, Inc. v. Chelsea Plaza Homes, Inc.*, 45 Kan. App. 2d 119, 243 P.3d 1106, 1110 (2010) (citation omitted).

[37] *See, e.g., Bettis v. Hall*, 2011 WL 1430327, at *4 (D. Kan. Apr. 14, 2011).

[38] *See id.* at *4 (reviewing cases).

[39] *Id.* (citing *Ireland v. Dodson*, 704 F. Supp. 2d 1128 (D. Kan. 2010); *Delta Grps. Eng'g, Inc. v. Spirit Spectrum, L.P.*, 229 P.3d 420 (Table), 2010 WL 1882143 (Kan. Ct. App. 2010)).

[40] *Id.* (citing *Fusion Inc. v. Neb. Aluminum Castings, Inc.*, 934 F. Supp. 1270 (D. Kan. 1996); *Paul Davis Restoration of Lawrence v. Raney Props., L.P.*, 157 P.3d 7 (Table), 2007 WL 1309807, at *2 (Kan. Ct. App. 2007)).

[41] Doc. 131.

-14-

2.    *MidAmerica did not Confer a Benefit Upon Cox*

Although *quantum meruit* is not procedurally barred, MidAmerica cannot establish the

claim as a matter of law because it did not confer a benefit upon Cox. The parties' arguments on

the benefit conferred issue originate out of the medical services that MidAmerica provided to

Patients 2 and 3. Cox contends that merely providing medical services to an insured patient does

not confer a benefit upon the insurance company. Both parties cite to authorities from other

jurisdictions that are split on the issue,[42] correctly noting that it appears to be a matter of first

impression under Kansas law.[43] MidAmerica insists, however, that this is not the benefit at issue

between the two parties. Rather, MidAmerica asserts that it conferred a benefit onto Cox through

the enhanced marketability and discounts Cox received by being a part of the First Health Network.

Because MidAmerica states that these are the benefits at issue, the Court does not address whether

---

[42] *See, e.g., Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240 (3d Cir. 2020) ("[T]he benefit conferred, if any, is not the provision of the healthcare services *per se*, but rather the discharge of the obligation the insurer owes its insured . . . to provide the person injured with medical or surgical attendance."). *But see, e.g., Encompass Off. Sols., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 939, 966 n.11 (E.D. Tex. 2011) ("The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured—which hardly can be called a benefit." (citation and quotation omitted)).

[43] The closest Kansas authority on the matter appears in *University of Kansas Hospital Authority v. Board of Commissioners of the County of Wabaunsee.* 299 Kan. 942, 327 P.3d 430 (2014). There, the University of Kansas Hospital Authority ("Hospital Authority") brought a *quantum meruit* claim against the Board of Wabaunsee County Commissioners ("County") for the cost of medical services it provided to a man after he jumped through a fourth-story window of the Wabaunsee County jail during an investigation. *Id.* at 943. The Hospital Authority argued that it conferred a benefit upon the County in doing so because the County was statutorily obligated to provide medical care to the man as a prisoner in the sheriff's custody. *Id.* at 946. The court disagreed and held that the County was not statutorily obligated to provide medical care to the man because he was only temporarily detained at the time of injury. *Id.* at. 960. Consequently, the *quantum meruit* claim necessarily failed, because "although the Hospital Authority provided a benefit to [the man], it did not provide a benefit to the County." *Id.*

Presumably, the court would have reached the opposite conclusion if the County was statutorily obligated to provide the man medical services because the Hospital Authority would have relieved that obligation in doing so. *See id. Hospital Authority* and how other jurisdictions reach different conclusions in the insurance company context suggest that the benefit conferred issue hinges on how Kansas law will characterize an insurance company's obligation to its insured: to provide medical services or to reimburse for medical services; a hospital providing medical services only relieves the former. *Compare Plastic Surgery Ctr., P.A.*, 967 F.3d at 240 (characterizing an insurance company's obligation as to "provide the person injured with medical or surgical attendance"), *with Encompass Off. Sols., Inc.* (characterizing an insurance company's obligation as to "pay health benefits"). Of course, Kansas law has not characterized an insurance company's obligation to its insured, and the Court will not do so here.

merely conferring medical benefits onto an insured patient also confers a benefit upon the insurance company as a matter of law.

The only legal authority in the health insurance context either party cites appears in Cox's reply, *Atlantic Neurosurgical Specialists P.A. v. Multiplan, Inc.*[44] In *Atlantic*, a health insurance network provider administered a provider network by contracting with various medical facilities to participate in the network, while separately contracting with insurance companies for the right to access the network.[45] The medical facilities and insurance companies were not parties to a contract together.[46] When a dispute arose between the parties on payment for medical services, one of the medical providers in the network brought *quantum meruit* claims against various insurance companies with access to the network.[47] The medical provider argued it conferred a benefit onto the insurance companies through enhanced marketability and a savings fee the companies received by having access to the provider network.[48]

The court addressed each purported benefit and concluded that the medical provider was not the party who conferred the benefits upon the insurance companies.[49] The court concluded that any enhanced marketability was conferred by the network provider, and that the benefit would continue regardless of whether the medical provider was a part of the network.[50] The court also

---

[44] 2023 WL 160084, at *7–8 (S.D.N.Y. Jan. 11, 2023) (interpreting the validity of a medical provider's *quantum meruit* claim against health insurance companies under New Jersey law).

[45] *Id.* at *1.

[46] *See id.*

[47] *Id.* at *3.

[48] *See id.* at *1, *7–8 (discussing how the provider network allowed insurance companies to access promotional materials for advertising to potential customers).

[49] *Id.*

[50] *Id.* at *8.

-16-

concluded that the savings fee benefit was "realized solely because of the agreements between" the network provider and insurance companies to which the medical provider was not a party.[51] Ultimately, the court concluded that the medical provider's "indirect conferral of benefits is too remote to sustain a claim for quantum meruit."[52]

The Court finds *Atlantic* persuasive on the facts of this case. The relationship between the parties in *Atlantic* mirrors the relationship between MidAmerica, Cox, and First Health. First Health contracted with MidAmerica to be a medical provider in the First Health Network while separately contracting with Cox for access to the First Health Network. MidAmerica and Cox are not parties to a contract together. Yet, MidAmerica asserts a *quantum meruit* claim against Cox for payment of medical services it provided to Patients 2 and 3, arguing it conferred benefits through the enhanced marketability and discounts Cox receives by having access to the First Health Network.

But MidAmerica is not the party who conferred these benefits on Cox, First Health is. Any enhanced marketability Cox received by having access to the First Health Network would remain even if MidAmerica was not part of it. Additionally, the discounts are only realized because of the agreement Cox has with First Health, to which MidAmerica is not a party. Ultimately, MidAmerica's indirect conferral of benefits by providing medical services to Patients 2 and 3 is too remote to sustain a claim for *quantum meruit* as a matter of law. Accordingly, the Court grants summary judgment in Cox's favor.

---

[51] *Id.* at *7.

[52] *Id.* at *8.

## IV.    Conclusion

MidAmerica bases its case against First Health on the Provider Agreement but misidentifies it as the controlling contract between the parties regarding the claims for Patients 1, 2, and 3. Instead, the MCA controls. Because MidAmerica cannot establish a breach of contract claim under the Provider Agreement and does not otherwise plead its case based on the MCA, First Health is entitled to summary judgment. Additionally, MidAmerica misidentifies itself as the entity who conferred the benefits of enhanced marketability and discounts onto Cox. Instead, First Health conferred those benefits. Accordingly, Cox is also entitled to summary judgment. For these reasons, the Court denies MidAmerica's motion and grants Defendants' motions.

**IT IS THEREFORE ORDERED** that Defendant Cox's Motion for Summary Judgment (Doc. 166) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 170) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant First Health's Motion for Summary Judgment (Doc. 174) is **GRANTED**.

**IT IS SO ORDERED.**

This case is closed.

Dated this 30th day of September, 2025.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

-18-